**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| **JACK TEIXEIRA**,<br><br>Plaintiff,<br><br>vs.<br><br>**FEDERAL BUREAU OF PRISONS** and **TODD BLANCHE**, in his official capacity as Attorney General of the United States,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br>26-cv-02158-CNS-MDB |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS**

Plaintiff Jack Teixeira respectfully opposes Defendants' Motion to Dismiss (ECF No. 17).

**INTRODUCTION**

Special Administrative Measures, or SAMs, are the most restrictive limits the federal government can place on a prisoner's ability to communicate with the outside world. The regulation that authorizes them in national security cases permits them only when they are "reasonably necessary to prevent disclosure of classified information," and only after the head of an intelligence agency certifies that "there is a danger that the inmate will disclose such information." 28 C.F.R. § 501.2(a). That language requires a *present* danger, not just a historical basis. But the Attorney General imposed SAMs on Teixeira based on a single sentence from a television interview, which the Attorney General misread as an admission that Teixeira "would make [. . .] disclosures again." Doc. 17-3 at 4. The Complaint alleges that Teixeira said no such thing: instead, a reporter asked whether, knowing that his conduct would bring a fifteen-year sentence, he would still have made the same choice at the time—back in 2022 or 2023—when he

made his ill-fated choice to disclose national security information. Compl. ¶¶ 16–20. Teixeira answered only that question about the past. *Id*.

The government's motion asks the Court to adopt the Attorney General's reading as "correct and, at least, rational," Doc. 17 at 9, and to dismiss all three counts on that basis. Because each of the government's arguments depends on resolving that dispute against Teixeira, the motion should be denied.

## BACKGROUND

The following facts are drawn from the Complaint and must be accepted as true for purposes of this motion.

### I. Teixeira's conviction and his confinement before the interview

Teixeira, now 24, posted national defense information on Discord, an online messaging platform, when he was a 21-year-old Air National Guardsman. Compl. ¶¶ 1, 4. In March 2024 he pleaded guilty in the District of Massachusetts to six violations of 18 U.S.C. § 793(e) and was sentenced to fifteen years in prison. *Id.* ¶¶ 10–11.

In January 2025 the Bureau of Prisons ("BOP") placed Teixeira at FCI Petersburg Medium, a medium-security facility, where he was housed in general population. *Id.* ¶¶ 3, 12. He has never been accused of violence or of acting for a foreign power. *Id.* ¶ 3. He has no incident reports. *Id.* ¶ 32.

### II. The interview

On May 20, 2025, Teixeira gave a telephone interview to an ABC News reporter. *Id.* ¶ 13. He admitted what he had done, expressed regret for the harm to his friends and family, and denied any anti-American intent. *Id.* ¶ 14.

The reporter then asked, "If you had the chance to do this again, would you take the same action?" Teixeira answered, "I believe that I ***would have***. Considering

everything that was going on ***at the time***, I believe I ***would have***, yes." *Id.* ¶ 16 (emphases added). The reporter followed up: "That action came with a 15-year prison sentence. And so, knowing that, you would still take that action." Teixeira replied at length and concluded, "But I still do believe that, yes, I ***would have*** done it again." *Id.* ¶ 17 (emphasis added).

The Complaint alleges what those words meant. Teixeira "was not in any way referring to repeating his actions in the future." *Id.* ¶ 18. He answered only the hypothetical-past question the reporter asked. *Id.* ¶¶ 19–20. He disclosed no national defense information and no classified information in the interview, and he said nothing that could rationally support the view that he posed a greater national security risk after the interview than before. *Id.* ¶¶ 21–23.

**III. The SAMs and their consequences**

On June 3, 2025, the Secretary of the Air Force certified that Teixeira "poses a danger of disclosing such information" because he stated "he would make the disclosures again." *Id.* ¶ 25. The Complaint alleges this was false. *Id.* ¶ 26. Teixeira has no intent to disclose national defense or classified information, now or ever, and he poses no danger of doing so. *Id.* ¶¶ 36–37.

On July 23, 2025, the Attorney General sent a memorandum to the Director of the BOP directing the imposition of SAMs under 28 C.F.R. § 501.2. *Id.* ¶ 27; Doc. 17-3. The memorandum relied expressly on the Secretary's certification that Teixeira had said "that he would make the disclosures again," and on its own assertion that Teixeira had made "statements that he would disclose such information again if given the opportunity." Compl. ¶ 28. It thus directed the BOP to restrict "Teixeira's access to the mail, the media, the telephone, other inmates, and visitors" for at least one year. *Id.*

The consequences have been severe. Teixeira's outgoing mail has been restricted such that his family has received only a small fraction of the letters he sends; his mother received no letters at all between December 23, 2025, and April 14, 2026. *Id.* ¶ 29. His calls with his family and his attorney have been restricted, and there have been months in which no family call was afforded. *Id.* ¶¶ 29–30. He was transferred to ADX, where he is confined to his cell for at least 23 hours a day. *Id.* ¶¶ 3, 33. He has had no visits since the SAMs were imposed. *Id.* ¶ 34.

## STANDARD OF REVIEW

A complaint survives a Rule 12(b)(6) motion if it contains enough factual allegations, accepted as true, "to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim." *Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1299 (10th Cir. 2025) (cleaned up).

Two limits govern the government's exhibits and its citation to a video. Doc. 17 at 3–4 & nn.2–4. First, a court may consider "documents referred to in the complaint," *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (cleaned up), but such documents "may only be considered to show their contents, not to prove the truth of matters asserted therein," *Tal v. Hogan*, 453 F.3d 1244, 1264 (10th Cir. 2006) (cleaned up). The SAM memoranda therefore establish only what the Attorney General wrote. Second, video is not properly considered on a motion to dismiss when its contents are "subject to

reasonable dispute," because the court "would have had to weigh evidence and make factual findings." *Fuqua*, 157 F.4th at 1299. The government reads *Fuqua* to permit consideration of a referenced video, Doc. 17 at 4 n.4, but the Tenth Circuit there affirmed a refusal to consider video because its contents were subject to reasonable dispute. *Id.* at 1295, 1299.

## ARGUMENT

### I. The Complaint states a claim under the Administrative Procedure Act.

Count I alleges that the SAMs are arbitrary and capricious and were imposed without the written certification the regulation requires. Compl. ¶¶ 55–58. The government responds that the SAMs were rational because Teixeira breached his plea agreement and because the Attorney General's reading of the interview was correct. Doc. 17 at 6–10. Neither argument supports dismissal.

### A. The Complaint plausibly alleges that the decision rests on a statement Teixeira did not make.

The Supreme Court has explained that while "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency," the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Agency action is arbitrary and capricious when, among other things, the agency "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

The Attorney General's memorandum identifies the facts on which it rests. It states that "Teixeira also stated that he would take the same actions again if given the opportunity," and supports that statement with a single quotation: "I still do believe that, yes, I would have done it again." Doc. 17-3 at 3. The operative finding follows: "Based upon information provided to me regarding Teixeira's history of disclosing national security information without authorization and his statements that he would disclose such information again if given the opportunity, I find that SAM are reasonably necessary to prevent disclosure of classified information." *Id.* at 4.

The finding therefore rests on two facts: (1) his conviction and (2) the alleged statement that Teixeira would disclose classified information again "if given the opportunity." The second fact is the one the Complaint disputes. The quoted sentence, "I would have done it again," describes a choice in the past, but the SAM memorandum accuses Teixeira of threatening future action—*i.e.*, action "if given the opportunity" *in the future*. *Id.* at 3. The government argues that "[t]he Attorney General's interpretation of Plaintiff's statements, though, is correct and, at least, rational," and that the Attorney General was not required to engage in "the metaphysical exercise of parsing his words." Doc. 17 at 9. First, whether the interpretation is "correct" is a question of fact that the Complaint answers in Teixeira's favor. Second, parsing the words is precisely what *State Farm* requires when the words are the evidence.

**B. The government's alternative rationale cannot sustain the SAMs.**

The government's lead argument is that "Plaintiff's unapproved appearance in the ABC Interview—in violation of his plea agreement—justifies the Attorney General's imposition of the SAMs." Doc. 17 at 7. This argument fails for two independent reasons.

First, it is not the basis the Attorney General gave. "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself," and "courts may not accept appellate counsel's post hoc rationalizations for agency action." *State Farm*, 463 U.S. at 50 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). The memorandum's finding is "[b]ased upon" two things only: the facts giving rise to Teixeira's conviction and "his statements that he would disclose such information again if given the opportunity." Doc. 17-3 at 4.

Second, even if the Attorney General had relied on the plea agreement, it would not matter. Section 501.2(a) authorizes SAMs that are "reasonably necessary to prevent disclosure of classified information." It does not authorize SAMs to sanction a breach of contract, and agency action that "relie[s] on factors which Congress has not intended it to consider" is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

**C. The Complaint plausibly alleges that the certification requirement was not satisfied.**

The Attorney General may direct national security SAMs only "upon written certification to the Attorney General by the head of a member agency of the United States intelligence community that the unauthorized disclosure of such information would pose a threat to the national security and that there is a danger that the inmate will disclose such information." 28 C.F.R. § 501.2(a). Congress has defined the "intelligence community" by statute to include, as relevant here, "[t]he ***intelligence elements*** of the Army, the Navy, the Air Force, the Marine Corps, the Space Force, the Coast Guard, the Federal Bureau of Investigation, the Drug Enforcement Administration, and the Department of Energy," 50 U.S.C. § 3003(4)(H) (emphasis added). The Department of the Air Force appears nowhere in that list; what appears is

the Air Force's "intelligence elements," in the same way that the list names the intelligence elements of the FBI but not the FBI as a whole.

The Complaint alleges that the certification here came from the Secretary of the Air Force, Compl. ¶ 25, and that the SAMs were therefore not based on "the required written certification to the Attorney General by the head of a member agency of the United States intelligence community," *id.* ¶ 56. The government's response is a footnote: "He is wrong—the Air Force Secretary issued that notification for both SAMs." Doc. 17 at 6 n.5. But the question is whether the Secretary of a military department is "the head of a member agency of the United States intelligence community" under a regulation that borrows a statutory term. At a minimum, the Complaint plausibly alleges that a precondition to the Attorney General's authority was not met.

The Court should deny the motion as to Count I.

## II. The Complaint states a First Amendment claim.

Count II alleges retaliation for protected speech. Compl. ¶¶ 62–66. The government argues waiver and, alternatively, that the SAMs are reasonably related to a legitimate penological interest. Doc. 17 at 10–14. Both arguments fail.

### A. The plea agreement did not waive Teixeira's First Amendment rights.

The government contends that by agreeing to a prepublication-review clause, Teixeira "waived his First Amendment right to any speech to news media without permission," and therefore "cannot now challenge the imposition of his SAMs." Doc. 17 at 11. But the clause imposes only an obligation to submit material for review of its national security content and nothing more. Doc. 17-3 at 3. A promise to submit material for review in no way operates as a release of claims against the government for retaliatory conduct.

The Tenth Circuit will "strictly construe" such waivers, and "any ambiguities in these agreements will be read against the Government." *United States v. Hahn*, 359 F.3d 1315, 1325 (10th Cir. 2004) (en banc) (cleaned up). The government's reading would convert the operative clause in Teixeira's agreement into a forfeiture of the right to communicate with one's mother. Compl. ¶¶ 28–30, 34. The government's authorities are inapposite: they involve a release of civil claims, *Town of Newton v. Rumery*, 480 U.S. 386, 393 (1987), a consent decree, *SEC v. Romeril*, 15 F.4th 166, 172 (2d Cir. 2021), and an appellate waiver, *United States v. Holzer*, 32 F.4th 875, 877 (10th Cir. 2022); none holds that a prepublication-review clause waives the right to challenge later prison restrictions. The leading prepublication-review case, *Snepp v. United States*, enforced such a clause through a constructive trust on the profits of the unreviewed book, 444 U.S. 507, 515–16 (1980); it did not suggest that breach licenses the government to cut off the author's contact with his family.

Finally, Teixeira's claim concerns what the Attorney General did with the content of his speech, and it stands even if the government is right that he needed permission to give the interview: the Attorney General imposed SAMs on account of what Teixeira said, reading his words as an admission he did not make. Compl. ¶¶ 28, 64.

**B. The Complaint pleads each element of a retaliation claim.**

A First Amendment retaliation claim requires proof "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally

protected conduct." *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007); *accord Requena v. Roberts*, 893 F.3d 1195, 1211 (10th Cir. 2018).

Each element is pleaded. First, a prisoner's speech to the press is protected activity. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Second, a year of restrictions on mail, telephone, visits, and media, followed by near-total isolation, would chill anyone of ordinary firmness. Compl. ¶¶ 28–34, 70. Third, the SAMs were undisputedly imposed because of the interview. Doc. 17-3 at 3–4.

The government argues that Teixeira must "allege specific facts" showing that "but for the retaliatory motive" the SAMs "would not have taken place." Doc. 17 at 12 (quoting *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)). *Peterson* was decided on summary judgment; the plaintiff lost because he "presented no evidence" that retaliatory motive was the but-for cause. 149 F.3d at 1144. The Complaint here pleads the but-for connection from the government's own document: absent the interview, there is no certification, no memorandum, and no SAM.

**C. The Complaint pleads facts from which it is plausible that the SAMs are not reasonably related to a legitimate penological interest.**

Because Teixeira is a prisoner, a restriction on his speech is valid if it "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). At the pleading stage, a prisoner must "plead facts from which a plausible inference can be drawn that the action was not reasonably related to a legitimate penological interest." *Gee*, 627 F.3d at 1188. A prisoner is "not required to substantively rebut the government's justifications"; he "simply needed to plead some plausible facts supporting his claim" that the restriction did not serve its stated purpose. *Al-Owhali v. Holder*, 687 F.3d 1236, 1241 (10th Cir. 2012). And a district court "misstate[s] the

standard" when it dismisses on the ground that "it is equally plausible as not" that the *Turner* factors favor the restriction. *Id.* at 1240 n.2. The government's argument that the Attorney General's reading was "at least, rational," Doc. 17 at 9, invites that error.

The Complaint pleads the facts *Al-Owhali* requires. It pleads that the interview disclosed no national defense or classified information. Compl. ¶¶ 21–22. It pleads that Teixeira had been housed in general population at a medium-security prison for months after sentencing without a SAM and without a single incident report. *Id.* ¶¶ 3, 12, 32. It pleads that he has never used a prison telephone or the prison mails to share sensitive information. *Id.* ¶¶ 40–41. It pleads that the stated basis for the SAMs is a statement he did not make, and that the government repeated that mischaracterization in the notice for his ADX transfer hearing. *Id.* ¶¶ 18–20, 26, 32.

The contrast with the government's cases is instructive. In *Al-Owhali*, the plaintiff, convicted for the 1998 embassy bombings, pleaded only that he had complied with his prior SAMs. 687 F.3d at 1241. In *Nicholson*, the plaintiff alleged that heightened restrictions rested on a mistaken belief that he had violated a SAM instruction, but the court found a legitimate basis independent of the mistake: he had pleaded guilty, while already in prison, to "one charge of conspiracy to act as an agent of a foreign government." *Nicholson v. Brennan*, No. 15-cv-01999-KLM, 2017 WL 4337896, at *5 (D. Colo. Sept. 28, 2017). Each of those plaintiffs was subject to SAMs on a basis independent of the disputed fact; here the disputed statement is the only new fact the Attorney General identified, and Teixeira had no SAM before it.

The Tenth Circuit, in *Al-Owhali*, cited *Mohammed v. Holder* as an example of a plausible SAM challenge. 687 F.3d at 1241 (citing *Mohammed v. Holder*, No. 07-cv-

02697-MSK-BNB, 2011 WL 4501959 (D. Colo. Sept. 29, 2011)). *Mohammed* explains why individualized facts matter. Because SAMs "are individually crafted to address the risk associated with" each inmate, "the question is not whether SAMs, generally, are rationally related to a penological objective, but instead whether the Government has shown that there is a rational connection between the particular SAMs applied to [the inmate] and a penological objective." 2011 WL 4501959, at *8. *Mohammed* reached that conclusion on summary judgment, on a record that included FBI affidavits, in a case brought by a man convicted in an embassy bombing. *Id.* at *1, *5–6, *10. The government asks this Court to do on the pleadings what *Mohammed* declined to do on a full record.

**D. The restrictions on outgoing mail are subject to the more demanding standard of *Procunier v. Martinez*.**

The government analyzes every restriction under *Turner*, Doc. 17 at 13, but in *Thornburgh v. Abbott* the Supreme Court held that *Turner* governs restrictions on *incoming* publications, and it preserved the stricter standard of *Procunier v. Martinez*, 416 U.S. 396 (1974), for "outgoing personal correspondence," which "did not, by its very nature, pose a serious threat to prison order and security." 490 U.S. 401, 411 (1989). Under *Martinez*, a restriction on outgoing mail "must further an important or substantial governmental interest unrelated to the suppression of expression," and "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." 416 U.S. at 413.

The SAMs already require that every piece of non-legal mail be copied and reviewed and that every family call be monitored as it happens. Compl. ¶¶ 30, 41; Doc. 17-3 at 10–13. A regime that reads every letter and listens to every call, and then also

withholds the letters for months, Compl. ¶ 29, is not obviously "no greater than is necessary" to prevent disclosure. *Mohammed* found a triable issue where the inmate "cannot communicate by telephone, writing, or personal visit with anyone other than the specified persons approved by his SAMs." 2011 WL 4501959, at *9. Here, every channel is restricted.

The Court should deny the motion as to Count II.

**III. The Complaint states a due process claim.**

A prisoner has a protected liberty interest in avoiding conditions that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Count III alleges that the SAMs have subjected Teixeira to near 24-hour-a-day solitary confinement since August 2025 "with almost zero telephone or mail communication with even his immediate family." Compl. ¶¶ 69–70.

**A. The government incorrectly focuses on prison placement.**

The government argues on the second factor that "[t]he conditions imposed at the ADX are not extreme." Doc. 17 at 16 (citing *Rezaq v. Nalley*, 677 F.3d 1001, 1014–15 (10th Cir. 2012)). But the Complaint expressly disclaims any challenge to Teixeira's placement at ADX, "given the discretion of the [BOP] over security classifications and placement determinations," and challenges instead "what is reviewable: the SAMs, which have unjustifiably resulted in extreme restrictions of his basic liberties." Compl. ¶ 3. *Rezaq* did not address that claim: it concerned transfers to the general population unit at ADX, was decided on summary judgment, and rested in part on evidence that "plaintiffs could communicate with other inmates." 677 F.3d at 1004–05, 1007, 1015. The SAMs here forbid contact with other inmates altogether. Doc. 17-3 at 5, 14.

**B. The Complaint pleads facts showing an atypical and significant hardship.**

The Tenth Circuit considers four nondispositive factors: whether the treatment relates to a legitimate penological interest, whether the conditions are extreme, whether the treatment increases the duration of confinement, and whether it is of indeterminate length. *Rezaq*, 677 F.3d at 1012. The inquiry is “a fact-driven assessment that accounts for the totality of conditions presented by a given inmate’s sentence and confinement.” *Id.*

On the first factor, the government’s argument depends on the premise that Teixeira said he would disclose again, Doc. 17 at 15, which the Complaint denies; if the premise is false, the SAMs relate to no legitimate penological interest at all.

On the second factor, the Complaint alleges that Teixeira is confined to his cell for at least 23 hours a day, that his letters do not reach his family for months at a time, that his family calls have been cancelled for entire months, and that he has had no visits since the SAMs were imposed. Compl. ¶¶ 3, 29–30, 34, 70. In *Wilkinson v. Austin*, the Supreme Court held that conditions in which “almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell” imposed an atypical and significant hardship “under any plausible baseline.” 545 U.S. 209, 223–24 (2005). That is the deprivation of “almost all human contact.”

On the third factor, Teixeira candidly has not alleged that the SAMs lengthen his sentence, but *Wilkinson* held that “[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context.” 545 U.S. at 224.

On the fourth factor, the government argues that the SAMs are not indeterminate because they “must be renewed every year.” Doc. 17 at 16 (quoting *Salim v. Sessions*,

No. 13-cv-03175-RM-CBS, 2017 WL 11487131, at *7 (D. Colo. May 2, 2017)). *Wilkinson* forecloses that argument. The Court there found the placement indefinite precisely because it was "indefinite and, after an initial 30-day review, is reviewed just annually." 545 U.S. at 224. The memorandum sets no end point: it directs SAMs for one year "subject to my further direction or the direction of a designated delegee," Doc. 17-3 at 4, and the government's own filing shows that they were extended in July 2026 on the same rationale, Doc. 17 at 6; Doc. 17-4 at 3–5.

**C. The Complaint pleads that the process afforded was inadequate.**

Periodic review of a continuing restriction must be real: "the review must be meaningful; it cannot be a sham or a pretext." *Toevs v. Reid*, 685 F.3d 903, 912 (10th Cir. 2012). The Complaint alleges that the only factual predicate for the SAMs is a statement Teixeira did not make; that the BOP repeated the same mischaracterization in the notice for his transfer hearing, Compl. ¶ 32; that his regional appeal received no response by the Regional Office's own extended deadline, *id.* ¶¶ 47–48; and that his final appeal to the Central Office received no determination at all, *id.* ¶¶ 49–50. A review process that never engages the disputed words and does not answer the prisoner's appeals is not meaningful.

The Court should deny the motion as to Count III.

**IV. Alternatively, the Court should grant leave to amend and to supplement.**

If any count is deficient, Teixeira requests leave to amend. *See* CNS Civ. Practice Standard 7.1B(b).

**CONCLUSION**

For these reasons, the motion to dismiss should be denied.

Date: August 31, 2026

Respectfully submitted,

*/s/ Kyle Singhal*
Kyle Singhal
D.C. Bar No. 1601108
*Counsel for Plaintiff*
Hopwood & Singhal PLLC
1701 Pennsylvania Ave., N.W. #200
Washington, DC 20006
(202) 769-4080
kyle@hopwoodsinghal.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Kyle Singhal*
Kyle Singhal